

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RTP/ADG/LZ/KMT
F. #2018R01916

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 16, 2024

By ECF

The Honorable Denny Chin
United States Circuit Judge
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall Courthouse
40 Foley Square
New York, NY  10007

      Re:    United States v. Eric Goldstein, et al.
              Criminal Docket No. 21-550 (DC)

Dear Judge Chin:

      The government respectfully submits this letter in advance of the sentencing hearings of the defendants Eric Goldstein, Michael Turley, Brian Twomey and Blaine Iler, which are scheduled for September 9, 2024, and in response to the following: (1) the Sentencing Memorandum of All Defendants Regarding Common Sentencing Guidelines Issues (ECF No. 201); (2) Twomey's Sentencing Memorandum (ECF No. 202) (3); the Sentencing Memorandum of Michael Turley (ECF No. 203); (4) Iler's sentencing letter (ECF No. 206); and (5) Goldstein's sentencing letter (ECF No. 207).[1]

      The Court should reject the defendants' pleas for probation and sentence the defendants to significant terms of imprisonment that promote respect for the law, provide just punishment, and deter the defendants and similarly-situated individuals from engaging in corrupt conduct that undermines the public's confidence in its government and officials.  Probation—or even the imposition of minimal prison terms—would be unjust and contrary to the purposes of sentencing.

---

[1] The submissions were all filed on August 2, 2024.

I.     The Advisory Guidelines Ranges of Imprisonment

The government, with one exception,[2] agrees with the Guidelines calculations set forth in the Presentence Sentence Investigative Reports prepared by the United States Probation Department for the Eastern District of New York.  Thus, the government submits that the advisory Guidelines ranges of imprisonment for the defendants are as follows:

| Defendant | Offense Level | Range[3] |
|---|---|---|
| Goldstein | 26 | 63 to 78 months |
| Iler | 24 | 51 to 63 months |
| Twomey | 24 | 51 to 63 months |
| Turley | 24 | 51 to 63 months |

A.     The Defendants' Objections to the PSR's Guidelines Calculations Are Meritless

The defendants make several objections to the Guidelines calculations.  None has merit.

1. An Eight-Level Enhancement under U.S.S.G. § 2C1.1(b)(2) is Warranted

The defendants argue that an eight-level enhancement under U.S.S.G. § 2C1.1(b)(2) does not apply because: (1) SOMMA Food Group LLC ("SOMMA")—the company owned and controlled by Iler, Twomey and Turley—made the bribe payments to Range Meats Supply Company, LLC ("RMSCO") and not directly to Goldstein; and (2) the defendants are entitled to an "offset" because the payments were "intended to cover services that were not corrupt."  (ECF No. 201 at 5).  Neither argument has merit.

U.S.S.G § 2C1.1(b)(2)(A) provides that "loss" is the greater of the amount of the bribe or the value of the "benefit received or to be received in return for the payment."  The gist of the defendants' argument is that the nearly $100,000 in payments from SOMMA to RMSCO did not constitute "value" to Goldstein because the payments were not made to Goldstein.  The trial evidence established that the payments went from SOMMA to RMSCO and then to Goldstein's divorce attorney, his father, or his college friend's law firm.  The trial evidence further established that Goldstein demanded these payments; he did so, of course, because they had "value" to him.  Any argument to the contrary is nonsense.

The defendants' related argument that they are entitled to an offset because the payments were made to pay legitimate expenses owed by RMSCO fares no better.  Take, for example, the December 2016 transfer of $66,670 from SOMMA to RMSCO, which represented the full amount of RMSCO's outstanding debts at that time.  The SOMMA defendants made this payment at the same time they transferred their interest in RMSCO to Goldstein.  The SOMMA

---

[2] The government does not advocate for Goldstein or Twomey receiving a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice.

[3] Each defendant is correctly placed in Criminal History Category I.

defendants were under no legal obligation to pay any of the debts accrued by RMSCO—indeed, that is why the SOMMA defendants set up the RMSCO as a separate LLC—but, as the jury necessarily found, they made the payment to induce Goldstein to take official action on SOMMA's behalf, namely so that he would approve SOMMA's products being placed back on school menus.  The payment provided Goldstein with a clean slate, RMSCO would be free of any debt without Goldstein's having to reach into his own pocket to pay the debt.  That, of course, was value to Goldstein.  Any argument to the contrary defies common sense and the reality of the defendants' agreement.

For these reasons, the total amount of bribe payments is, as set forth in the PSR, $96,670.39, and an eight-level enhancement is therefore warranted.[4]

2. A Two-Level Enhancement Under U.S.S.G. § 2C1.1(b)(1) is Warranted

The defendants next argue that the two-level enhancement under U.S.S.G. § 2C1.1(b)(1) for an offense involving more than one bribe should not apply because the government has not established that the $10,000 payment from SOMMA to RMSCO in May 2016 was a bribe or that the $20,000 payment from SOMMA to RMSCO in October 2015 was a bribe to menu SOMMA's chicken drumsticks two times a month.  (ECF No. 201 at 16).  Again, the defendants are wrong.

As an initial matter, the defendants do not dispute that the $66,670 transfer in December 2016 from SOMMA to RMSCO was a bribe.  Moreover, although the defendants focus on the October 2015 and May 2016 transfers, the defendants ignore the trial evidence that established that in January 2016, the SOMMA defendants sent Goldstein a PowerPoint presentation detailing the amount of money he stood to gain from their RMSCO partnership, which the Court found was done to induce Goldstein to overturn a fine that SchoolFood staff was set to impose on SOMMA.  (ECF No. 181 at 31).  Because "payment" under U.S.S.G. § 2C1.1(b)(1) means "anything of value" and "need not be monetary," the sending of the PowerPoint presentation in January 2016 constitutes a second bribe.

Moreover, that the jury's general verdict did not indicate whether the October 2015 transfer from SOMMA to RMSCO was a bribe does not, of course, foreclose it from being considered a bribe for sentencing purposes.  The trial evidence establishes—certainly by a preponderance of the evidence—that it was.  As the Court has already concluded: "[a] few days after the [October 2015] transfers, SOMMA's drumstick was expedited so that it would debut in

---

[4] The cases cited by the defense do no indicate otherwise.  In United States v. Ring, 811 F. Supp. 2d 359 (D.D.C. 2011), for example, the court noted that "where a defendant pays a bribe in return for being awarded a government contract, the 'value of the benefit' is the *profit* made on the contract, not the gross value of the contract."  Id. at 375-76 (citing U.S.S.G. § 2C1.1 cmt. n.2).  Here, however, because it would be difficult to quantify the profit that SOMMA expected to make by bribing Goldstein, the loss is simply the bribe payments made to Goldstein, which was magnitudes less than the profits SOMMA expected to make (even if they cannot be quantified).  Indeed, as a result, the Guidelines calculation that the defendants complain overstate the seriousness of their offense likely understate the true "loss" amount.

3

December instead of January." (ECF No. 181 at 31 (citing GX 336, 355)). It is well settled that the timing between a payment received by an official and his taking an official act is alone sufficient circumstantial evidence to infer that the payment was a bribe. See United States v. Biaggi, 909 F.2d 662, 684 (2d Cir. 1990). But the trial evidence established more: (1) Goldstein was the ultimate decisionmaker for SchoolFood; (2) the SOMMA defendants discussed among themselves telling Goldstein that they wanted the debut date advanced (GX 320); (3) Goldstein inquired with his staff about the launch date; and (4) the date was advanced. Thus, the evidence clearly established that it is more likely than not that the October 2015 payment was a bribe.

3. Iler Was Not a Minimal Participant

The Court should reject Iler's argument that he is entitled to a four-level reduction under U.S.S.G. § 3B1.2(a) because he was a "minimal participant" in the scheme. The gist of Iler's argument is that his relative youth and inexperience led him to not fully appreciate the "red flags and warning signs" attendant to the SOMMA defendants' relationship with Goldstein. (ECF No. 206 at 25-26). This is a feeble attempt by Iler to minimize his culpability—the SOMMA defendants, including Iler, are sophisticated businessmen and the red flags and warning signs would be obvious even to the most unsophisticated businessman.

4. Goldstein Was a High-Level Decisionmaker

The Court should also reject Goldstein's argument that a four-level enhancement under U.S.S.G. § 2C1.1(b)(3) is not warranted because Goldstein was not a "high-level decisionmaker." (ECF No. 207 at 19-21). Section 2C1.1(b)(2) defines a high-level decision-making or sensitive position" as a "position characterized by direct authority to make decisions for, or on behalf of, a government department, agency, or other governmental entity, or by a substantial influence over the decision-making process." See Application Note 4. The Commentary provides examples of a public official in a high-level decision-making position including "a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority." See id. The notion that Goldstein, who was the Chief Executive Officer of School Support Services, responsible for SchoolFood, athletics and busing, was not a high-level decisionmaker is, candidly, disingenuous, and the Court should summarily reject it.[5]

---

[5] United States v. Stephenson, 895 F.2d 867 (2d Cir. 1990), does not help the defense. Stephenson was an Export Licensing Officer making approximately $40,000 a year whose duties included reviewing applications for approval to export high-technology equipment from the U.S. to other countries. The Circuit held that he was not a high-level decisionmaker; rather, he was a "mid-level Government employee" whose position as a licensing officer did not "set him apart from a multitude of personnel in the federal service." Id. at 877-78.

In contrast, even the defendants admit that Goldstein was a high-level decisionmaker. In response to a question asking Goldstein whether he was the ultimate decision-maker, Goldstein responded "I was the chief executive of School Support Services and I oversaw School Food and made decisions, yes." (Tr. 2019:14-17). The defendant Brian Twomey responded, "That's fair,"

II.     The Court Should Sentence the Defendants to Significant Prison Terms

The defendants advance several arguments for why the Court should not sentence them to prison, including stressing that, in their view, the advisory Guidelines set forth in the PSRs are incorrect and, in any event, overstate the seriousness of their conduct.  They contend that sending them to prison is not necessary because they are first-time offenders with strong family ties and therefore unlikely to recidivate.  They plead that they have already been punished because their reputations are tarnished and they have suffered financially, and that sending them to prison on top of these collateral consequences would be unduly harsh.  They suggest that because courts in the Second Circuit routinely sentence white-collar, non-violent offenders to sentences significantly below the low-end of the applicable Guidelines range, they too are entitled to leniency.

It is difficult to reconcile the defendants' claim that there is no need for specific deterrence when they fail to acknowledge that they did anything wrong, let alone that they intended to, and did in fact, commit serious crimes.  The defendants claim that they "respect" the jury's verdict, but it is clear from their submissions that they believe they are the real victims of this prosecution, and that the government, jury and the Court all have it wrong.  Goldstein incredulously argues that he was not a high-level decision maker, even though he was the chief executive officer of DOE's School Support Services and contends—just as incredulously—that the decisions he made to benefit the SOMMA defendants were based on the merits and not at all influenced by the payments and promises of future rewards he received from the SOMMA defendants.  Twomey persists in claiming that he acted in good faith because he consulted attorneys when setting up—and subsequently dissolving—RMSCO, even though he and the other defendants willfully concealed the true extent of their corrupt relationship from those same attorneys, not to mention their investors and the New York City Department of Education.  Iler argues that he is less culpable because he was younger and less experienced than his co-defendants and therefore lacked the business acumen to recognize the red flags attendant to his relationship with Goldstein, even though the most unsophisticated of businessmen would have known that it was a bad idea.  Turley simply blames everyone but himself for his situation.  The government is skeptical that the defendants have learned their lesson, particularly in light of Goldstein's and Twomey's trial testimony in which they refuse to even acknowledge that their clearly improper relationship was a conflict of interest.  A prison term is necessary to deter the defendants and to promote their respect for the law.

The defendants' personal histories or characteristics do not entitle them to leniency.  The fact that the defendants are first-time offenders is taken into account by recent amendments to the Guidelines and their being placed in Criminal History Category I, and no further consideration is warranted.  While the defendants have families who love them and rely on them for financial and emotional support, so do the vast majority of defendants who appear before the court for sentencing.  And while the defendants have all likely suffered reputational

---

in response to the question, "You went to Goldstein because Mr. Goldstein was the ultimate decision maker at School Food and you knew that, right?" (Tr. 1629:22-25).

harm and financial consequences stemming from their arrests and convictions, "middle class sentencing discounts" are not permitted. See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999); see also United States v. Morgan, 635 Fed. Appx. 423, 445-46 (10th Cir. 2015) ("By considering publicity, loss of law license and deterioration of physical and financial health as punishment, the court impermissibly focused on the collateral consequences of Morgan's prosecution and conviction. . . . None of these collateral consequences are properly included in Morgan's sentence. They impermissibly favor criminals, like Morgan, with privileged backgrounds. And, paradoxically, in this case they favor a popular politician who corruptly sold influence, not only violating the law but also betraying solemn obligations and the public's trust"). To put it bluntly, there is nothing extraordinary or unique about the defendants' backgrounds or characteristics that merit lenient, below-Guidelines sentences.

Instead, the Court should impose significant terms of imprisonment for each defendant to promote respect for the law, provide just punishment, and deter these defendants and, more importantly, individuals similarly situated to them from engaging in corrupt conduct that undermines the public's confidence in its government and officials. Probation—or even minimal prison terms—would be unjust and contrary to the purposes of sentencing.

The defendants spend much of their submissions arguing that the Guidelines calculations set forth in their respective Presentence Investigation Reports are incorrect and overstate the seriousness of their conduct. As set forth above, the defendants are wrong. And while the defendants contend that because district courts routinely give below-Guidelines sentences to white-collar criminals, they should therefore receive similar sentences to avoid creating sentencing disparities, the Second Circuit has repeatedly rejected this argument as a basis for imposing a below-Guidelines, lenient sentence. See United States v. Valente, 844 Fed. Appx. 430, 432-433 (2d Cir. Feb. 22, 2021) ("[A]ssuming *arguendo* that some judges have chosen as a policy matter not to sentence white collar criminals to the harshest permissible punishments, this does not entitle other white collar criminals to lighter punishments than are reasonable under the Guidelines, 18 U.S.C. § 3553(a), and the totality of the circumstances of their individual case") (quoting United States v. Goffer, 531 Fed. Appx. 8, 23-24 (2d Cir. 2013).

Moreover, even if the Guidelines did overstate the seriousness of the defendants' conduct, probation would still not be warranted. Judge Rakoff's decision in United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2022), a case relied on by the defendants, demonstrates why significant prison terms in this case are appropriate. Gupta, a Goldman Sachs executive, was convicted at trial of securities fraud for providing material, non-public information about Goldman Sachs' financial condition during the nation's 2008 financial crisis to Raj Rajaratnam. Rajaratnam used the information to make millions of dollars in illegal trades. Gupta did not make any money off the tips; rather, his motive in providing the information seemed to be born from a desire to obtain future benefits and opportunities from Rajaratnam. Id. at 354.

Judge Rakoff concluded that the advisory sentencing guidelines range of imprisonment of 78 to 96 months' imprisonment did not fit the facts of that case because Gupta did not make any money from his conduct; rather, the loss amount was driven by the amount of money made by Rajaratnam, which was not a reasonable proxy of the harm caused by Gupta. Id. at 353. Judge Rakoff further noted that it had "never encountered a defendant whose prior

history suggests an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need," id. at 354, and concluded that, given the reputational harm Gupta had suffered, a prison term was not necessary to deter him from committing future crimes, id. at 355.

But Judge Rakoff rejected the notion that a probationary sentence would be appropriate because while Gupta need not be deterred, "[g]eneral deterrence, however, suggests a different conclusion. As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." Id. Judge Rakoff is, of course, not alone in emphasizing the critical role that general deterrence plays in fashioning a sentence in white-collar cases like the one before the Court. It is well-settled that "[g]eneral deterrence is more apt, not less apt, in white collar crime cases. The reason is that economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence." United States v. Howard, 28 F. 4th 180, 209 (11th Cir. 2022) (citations and punctuation marks omitted). "White collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that would-be white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." Id.

Ensuring that the sentences imposed on these defendants deter others is not the only reason why the Court should impose significant prison terms. As Judge Rakoff noted in Gupta, "just punishment" is an important factor in fashioning an appropriate sentence, particularly when dealing with white-collar crimes that typically involve "not only a sophisticated form of cheating but also a fundamental breach of trust and confidence" that the public abhors. Thus, "[w]hile no defendant should be a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose." Id.

The same principles in Gupta apply here, perhaps even more so given that the defendants' victims were not large financial institutions like Goldman Sachs but the DOE and the students and families it serves. Imposing probationary sentences—or even modest prison terms—would send the wrong message to the public and others similarly situated to the defendants. Instead, the Court should send a clear, unequivocal message to would-be wrongdoers: if you get caught committing serious crimes that corrupt our government for your own greed and purposes, you will go to prison.

The defendants try to mitigate the harm they caused by claiming that Goldstein took official actions that were "justified and that "probably would have occurred, on the merits, without any bribery."[6] There is no evidence supporting this claim for the simple reason that it is

---

[6] The defense also argues that they are less culpable than other corrupt criminals because their conduct benefited the public. See ECF No. 207 at 19 ("That reality sets this case apart from other corruption cases. Eric's conduct, even if the Court deems it ran afoul of the law, was far less culpable than conduct that involves unwarranted or improper governmental actions that are

not possible to know what might have occurred absent the defendants' corrupt relationship. Indeed, it is precisely because of the defendants' corrupt conduct, that the public will never know for sure, and it is this uncertainty stemming from a lack of transparency by public officials that erodes the public's confidence in government. SOMMA's competitors are left to wonder whether their products were not accepted because of Goldstein's relationship with the SOMMA defendants. Vendors doing business before the DOE going forward will wonder whether they too will need to make payments to DOE officials in order to get their products approved. These are the harms that the federal corruption statutes are designed to deter and, when violated, punish. The Court can restore the public's trust in government by imposing significant prison terms on these defendants.[7]

                                              Respectfully submitted,

                                              BREON PEACE
                                              United States Attorney

                              By:    /s/
                                              Robert T. Polemeni
                                              Andrew D. Grubin
                                              Laura Zuckerwise
                                              Kaitlin McTague
                                              Assistant U.S. Attorneys
                                              (718) 254-7000

cc:     Counsel of Record

---

against the interests of constituents."). This argument is a red herring. Officials often, if not always, take actions that benefit the public while taking bribes to do so. Indeed, to do otherwise, that is, to make decisions that go against the interests of their constituents, risks questions being raised of officials and their corrupt arrangement being revealed.

[7] Similarly, the defendants' suggestion that students "needed" SOMMA's chicken products is particularly galling given that students repeatedly complained of foreign products being found in the products and a SchoolFood employee choking on a bone found in SOMMA's chicken products. Students are undoubtedly better off without SOMMA's chicken products on the menu. Instead, the evidence showed that Eric Goldstein "needed" the SOMMA defendants, and the SOMMA defendants "needed" Goldstein. Goldstein no longer wanted to serve as a public official and the SOMMA defendants were his ticket out of public service. The SOMMA defendants imagined tens of millions of dollars coming from the sales of its products to SchoolFood and Goldstein was their ticket in.